**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RESCO PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Case No. 06-235 |
| BOSAI MINERALS GROUP CO., LTD., | ) | |
| and CMP TIANJIN CO., LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

CONTI, Chief District Judge.

### I.   INTRODUCTION

Resco Products, Inc. ("plaintiff"), individually and as a class representative, brought a claim against Bosai Minerals Group ("Bosai") and CMP Tianjin Co. ("Tianjin") (collectively, "defendants") alleging a conspiracy to fix the price and limit the supply of refractory grade bauxite in violation of the Sherman Act, 15 U.S.C. § 1.  Pending before the court is defendants' motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 263).  Upon consideration of the parties' submissions and the applicable law, the court concludes defendants are entitled to judgment as a matter of law.  Their motion will be granted and the action dismissed.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff's principal place of business is in Pittsburgh, Pennsylvania. (ECF No. 92 ¶ 7). Plaintiff manufactures refractories—*i.e.*, "heat resistant materials that provide the linings for high temperature furnaces, reactors, and other processing units." (*Id.* ¶ 28.) Bauxite is one of the raw materials plaintiff uses in the manufacture of refractories. Since at least the mid-1980s, a substantial percentage of the "refractory grade" bauxite ("RGB") consumed throughout the world has been exported from China. (*Id.* ¶¶ 30, 32–33.) Defendants are two of China's largest RGB exporters. (*Id.* ¶¶ 8–9.)

Sometime before 1990, the Chinese government implemented industry-specific import-export "chambers of commerce," in place of government "ministries," to administer its export control laws and regulations. (ECF No. 284, Part I ¶ 14.) The "routine administration" of these "social organizations with function of business coordination and partial administration in a line of trade" was to "be under the direct charge of [the Chinese Ministry of Commerce]" ("MOFCOM").[2] (ECF No. 268-23 at 5.)[3]

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[2] Prior to being renamed, the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") was known as the Ministry of Foreign Economic Relations and Trade ("MOFERT"). (ECF No. 268-23 at 2.) Later, the MOFTEC became known as the MOFCOM (ECF No. 284, Part I ¶ 19), short for "Ministry of Commerce." (ECF No. 268-22 ¶ 3.) For simplicity, all three of these organizations will be referred to as "MOFCOM" regardless of which was active at the relevant time.

[3] The "Measures for Administration of Foreign Economic Relations and Trade Social Organizations" cited here, as well as many of the other documents produced as evidence, are

In its 1994 "Articles of Association," the China Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters ("CCCMC") described itself as

> a body corporate, consist[ing] of various kinds of enterprises incorporated within the territory of [China] in accordance with the laws, conducting import and export trading business of metal, mineral and chemical commodities, as well as providing with coordination among the industry and other services to the corporations, as approved by the [MOFCOM]. . . .

(ECF No. 268-3 at 1.) The announced purpose of the CCCMC is "to coordinate the import and export trading activities of [the] metal, mineral and chemical industry; to secure the normal order of import and export trading; to protect the legal rights and interests of the state; . . . and to serve to expand the import and export trading of metal, mineral[,] and chemical commodities." (*Id.*) In furtherance of its purpose, the CCCMC was given the power to establish, subject to MOFCOM approval, a "Branch" for all CCCMC members engaged in the trade of each given commodity. (*Id.* at 4.) The CCCMC exercised this power to create the Bauxite Branch, of which both defendants are members. (ECF No. 284, Part II ¶ 5.)

In 1996, MOFCOM implemented "Export Quota Bidding with Compensation." (ECF No. 268-2 at 2.) The "Detailed Rules" of this implementation define a "Bidding Committee for Quotas of Export Commodities" (the "Bidding Committee"), which was to "undertake the responsibilities of administering the bidding work for export quota with compensation." (*Id.* at 2.) MOFCOM required the Bidding Committee to set up a "Bidding Office" to interact with the chambers of commerce and handle the "routine affairs of compensated quota bidding." (*Id.* at 3.) The Bidding Committee was to "be accountable to [MOFCOM]," and the Bidding Office was set up to "be accountable to the Bidding Committee." (*Id.*) Though multiple "modes" of quota

---

English translations of Chinese originals. Grammatical irregularities appear throughout as apparent artifacts of the translation process.

bidding are defined within these rules, the practice generally consists of an annual "quota," which is the total amount of a given commodity that can be exported within the subject year; individual exporters "bid" for the right to export some portion of the total quota. *See* (ECF No. 268-26.) The Bidding Committee was authorized to set the amount of a commodity's annual quota up for bid on any occasion and the minimum and maximum amounts for bids. (*Id.* at 7.)

Under the quota bidding system, in addition to meeting other requirements, an aspiring exporter was required to pay an export license fee for each ton of a commodity it wished to export. (ECF No. 284, Part I ¶ 19.) For bauxite prior to 2005, under what was referred to as "paid use," the license fee was set at 230 Chinese yuan ("CNY") per ton. *Id.*; (ECF No. 268-52 at 2; ECF No. 268-53 at 1; ECF No. 268-54 at 2.) Beginning in 2005, bauxite exporters had to bid the amount they would pay for the license fee. (ECF No. 284, Part I ¶ 19.) According to public bidding announcements from 2005 through 2012, a bid had to be in an amount greater than the minimum set by the Bidding Committee in order to be considered valid. (ECF Nos. 268-55 through 268-67.)

Aside from the power of the Bidding Committee over the quota bidding processes, the Branches performed several functions with respect to import and export policy. The scope of these functions and the Bauxite Branch's autonomy in performing them, however, are less than clear based upon the evidence produced in this case. Among other "authorities" granted to the Branches by CCCMC in 1994, they were tasked with "formulating or amending detailed coordination regulations in respect to import and export commodities" and "formulating or adjusting the price proposals of import and export commodities." (ECF No. 268-3 at 4.) In its "Measures for Coordination Management of Bauxite Branch" ("Coordination Measures"),

adopted no later than 1999 (ECF No. 284, Part I ¶ 15), the Bauxite Branch was instructed to engage in "coordination work" that would be "favorable for protecting the fair competition" and "preventing and deterring the undesirable competition that impairs the interests of the state and the industry" and "favorable for self-regulation, self-discipline, self-protection, and self-development of the enterprise group." (ECF No. 268-4 at 2.) The "content" of this coordination work was defined to include "[e]xport price," among various other topics. (*Id.*)

These terms appear throughout later CCCMC and Bauxite Branch governing documents. In its 2001 Charter, the CCCMC provided that one of its purposes was to "coordinate and instruct the import and export trading activities. . . ." (ECF No. 268-5 at 2.) According to the Bauxite Branch's 2003 Articles of Association, it is a "self-regulation trade organization" with a tenet of "conduct[ing] the coordination and guidance on the import and export trade of the bauxite." (ECF No. 275-4 at 1.) Specific actions to be taken by the CCCMC and the Bauxite Branch in furtherance of coordination, self-regulation, and self-discipline are not spelled out. Based on the 2001 "Measures for Quota Bidding of Export Commodities," however, MOFCOM "is responsible for deciding and announcing the types and the total quota quantity of commodities subject to bidding." (ECF No. 268-30 at 2.)

Despite the formal allocation to MOFCOM of power over export quotas, Liu Jian Hong ("Hong"), Bosai's vice president, explained in an October 27, 2005 email that "CCCMC will have meeting on Nov 12th to discuss/decide the quantity/price of bauxite quota in 2006." (ECF No. 275.) The Bauxite Branch was to have annual "General Meetings" according to its 2003 Articles of Association. (ECF No. 275-4 at 7–8.) Notices sent out in advance of the 2004, 2005, and 2010 meetings indicate these meetings were held at hotels over two to three days. (ECF No.

268-9; ECF No. 268-11; ECF No. 268-16.)   Announced topics of these meetings included "advanced research of market trends" (ECF No. 268-9 at 1), "[d]iscussing the total amount of bidding quota" (ECF No. 268-16 at 1), and a "vote" on the "coefficients" or "parameters" for quota bidding in the following year (ECF No. 268-9 at 1; ECF No. 268-11 at 1; ECF No. 268-16 at 1.)   The minutes of the November 12, 2005 Bauxite Branch meeting indicate that six "opinions" were voted on, but only one "bec[a]me [an] industry resolution. . . ." (ECF No. 275-11 at 1.)   "After the meeting, thirty-one members proposed to set the base price for 2006 bauxite export quota bidding at 100." (*Id.*)

The minutes from the other yearly meetings held between 2004 and 2010 reflect that "proposals" related to quota amount and price for the export quota were discussed and voted on. (ECF Nos. 268-10, 268-12, 268-13, 268-15, 268-17.)   Most of these proposals, however, failed to pass after a vote.[4]   Of the four proposals related to either quota amount or price for the export quota that passed during this time period, two were at odds with actions ultimately taken by the Bidding Committee.   In 2008, despite the Bauxite Branch's successful resolution that the export quota be set at "1 million or more" (ECF No. 268-13 at 2), the Bidding Committee announced only 940,000 tons available for bid. (ECF Nos. 268-60, 268-61.)   The following year, although the Bauxite Branch had passed a resolution to "maintain" the quota at 940,000 metric tons, the

---

[4] In 2004, proposals to "set the bauxite export quota at one million tons" and "to set 180 as the minimum price for 2005 export quota" "failed to pass in the enlarged council meeting." (ECF No. 268-10 at 2.)   Proposals "to set the bauxite export quota at 1 million metric tons for 2007," "to maintain the level of bauxite export quota at 970,000," and "to set the minimum price for 2007 bauxite export quota at 130/ton," "100/ton," "60/ton," and "80/ton" all "failed to pass in the enlarged council meeting" in 2006. (ECF No. 268-12 at 2–3.)   During the 2007 meeting, proposals to set the 2008 bauxite export quota at 950,000, 1 million, and 1.1 million metric tons similarly failed. (ECF No. 268-13 at 1–2.)   A 2009 proposal that the 2010 bauxite export quota "be cut down by 30%–50% of total volumes" failed to pass as well. (ECF No. 268-17 at 1.)

Bidding Committee made available only 930,000 tons.[5]  The only successful resolution of the

Bauxite Branch related to the bauxite quota was one passed during the 2009 meeting specifying

that the export quota "remain at 930,000 tons."[6]  (ECF No. 268-17 at 1.)

In his declaration for the CCCMC, Liu Jian ("Jian"), a CCCMC employee since 1995 and

deputy director of the Bidding Office since 2006, provided the context for the Bauxite Branch

resolutions and the often divergent actions of the Bidding Committee.  (ECF No. 268-22.)  Jian

explained that "[a]t Bauxite Branch meetings, Bidding Office staff asked the Bauxite Branch

members for their opinions about specific proposed quota amounts, quota bidding minimum

prices, and other matters relating to quota bidding."  (*Id.* at 2.)

> "Passage" of a Bauxite Branch resolution indicated that a certain percentage of
> exporting industry members were in favor of a proposal, but the authority and
> power to adopt quotas, and to establish the quota amount, minimum bidding price,
> and other terms, was always with MOFCOM, not the members or the CCCMC.
> MOFCOM could, and often did, set the quotas and minimum bidding prices at
> levels different than those favored by members.

(*Id.* at 3.)

Aside from the formal discussions at the Bauxite Branch annual meetings, there was also

ample opportunity for informal private discussions between attendees.  Haijian Liu ("Liu"),

---

[5] Only one of the Bidding Committee's announcements concerning the 2009 bauxite export quota was produced here.  The conclusion that the 2009 quota was 930,000 primarily is based on a Bauxite Branch proposal at the 2009 meeting that the quota "remain at 930,000 tons."  (ECF No. 268-17, at 1).  It is supported by the Bidding Committee's first announcement on bauxite export quotas for 2009, which specifies 465,000 tons available.  (ECF No. 268-62, at 2).  Announcements in other years show that 50 percent of the total annual quota was released with each announcement.  (ECF Nos. 268-55, 268-56, 268-57, 268-58, 268-60, 268-61, 268-63, 268-64, 268-65, 268-66.)

[6] According to the minutes, the only other relevant resolution that "passed and came into resolution" was one to "maintain the minimum price for the bauxite export quota at 130/ton," which passed during the 2008 Bauxite Branch meeting.  (ECF No. 268-15 at 2.)  No evidence was produced to indicate what the Bidding Committee set the minimum price for the quota following this resolution.

Tianjin's general manager in 1998 and its current chief executive officer, testified that meals were provided for meeting attendees in the conference room, instead of requiring them to separate at meal times. (ECF No. 275-15 at 40–41.) Liu testified that in private conversations, attendees sometimes complained about "low" export prices for RGB. (*Id.* at 86–87.) Hong similarly testified that companies sometimes complained about contract prices reflected in customs data because they were "not reasonable." (ECF No. 275-17 at 96–97.) Private conversations also took place between Bosai and Tianjin executives outside Bauxite Branch meetings on multiple occasions since 2002, both in person and over the telephone. (ECF No. 284, Part II ¶ 21.)

According to plaintiff, the "price of RGB in the United States doubled during 2003 and 2004 and increased an additional 70 [percent] between 2004 and 2007." (*Id.* ¶ 4.) Bosai explains the increase by noting that its "costs for RGB more than quadrupled between 2003 and 2008" and its "transportation, loading, energy, and storage costs also increased." (ECF No. 284, Part II ¶ 4.) In particular, the Chinese government reinstituted a 13 percent value-added tax ("VAT") on bauxite exports in 2003 and implemented a 15 percent duty on bauxite in 2008. (*Id.*) China also took certain actions for pollution control reasons, including eliminating older-technology bauxite processing facilities and placing limitations on the transportation of commodities. (*Id.*) During this period, domestic demand for bauxite "sharply increased." (*Id.*) With all these variables considered, Bosai noted that "[o]ver the same period, Bosai's RGB export price increases closely tracked the levels of the increases in prices Bosai paid for RGB." (*Id.*)

Plaintiff filed a complaint on February 2, 2006, asserting that defendants[7] violated the Sherman Act, 15 U.S.C. § 1, by conspiring to "limit competition, control supply, and increase prices for [RGB] products." (ECF No. 1 ¶ 2). Plaintiff brings this action under the Clayton Act, 15 U.S.C. §§ 15 and 26, seeking treble damages and injunctive relief on its own and on behalf of a putative class. (ECF No. 92, ¶¶ 3, 17–18.)

On October 7, 2009, defendants filed a joint motion to dismiss for lack of subject-matter and personal jurisdiction.[8] (ECF No. 98.) The court denied this motion without prejudice on June 4, 2010, and the case was stayed pending the release of a final report in a then-pending World Trade Organization proceeding with potential implications on the applicability of the "act of state" and "sovereign compulsion" doctrines to the instant matter. (ECF No. 146 at 2 (citing *China–Measures Related to the Exportation of Raw Materials*, WTO Doc. WT/DS394/7 (Nov. 9, 2009).) The stay was lifted on July 26, 2011.

Defendants again filed a joint motion to dismiss on August 16, 2011. (ECF No. 174.) After an unsuccessful attempt at mediation (ECF Nos. 186, 191), the court denied this motion on January 9, 2012. (ECF No. 194.) Plaintiff was required to file a more definite statement with respect to paragraph 61 of its first amended complaint to specify "what effects of the cartel are

---

[7] In plaintiff's original complaint, it named the following as defendants: Nanchuan Minerals Group Co. Ltd.; Jersey Mineral Processing Co. Ltd.; CMP Ltd., Minelco Tianjin Minerals Co. Ltd.; Minelco, Inc., USA; and LKAB. (ECF No. 1.) Due to ineffective service of process, LKAB, Minelco Tianjin Minerals Co. Ltd., and Minelco, Inc., USA were dismissed by stipulation (ECF Nos. 16, 43), and Nanchuan Minerals Group Co. Ltd. and Jersey Mineral Processing Co. Ltd. were terminated. Plaintiff filed its first amended complaint on July 17, 2009, naming only Bosai and Tianjin as defendants. (ECF No. 92.) Bosai was previously known as Nanchuan Minerals Group Co. Ltd. and Tianjin was previously known as Jersey Mineral Processing Co. Ltd. (ECF No. 92, ¶¶ 8–9.)

[8] Tianjin filed a separate motion to dismiss for lack of personal jurisdiction that same day (ECF No. 99), but withdrew it on May 12, 2010. (ECF No. 142.)

separate and distinguishable from any government mandated ex parte restriction." (*Id.* at 2–3.) After plaintiff filed the more definite statement (ECF No. 193), defendants filed their answers on February 23, 2012. (ECF Nos. 197, 198.)

Discovery related to liability closed on February 27, 2015.  (ECF No. 249.)  Defendants filed a motion for summary judgment on May 29, 2015 (ECF No. 263), followed by a supporting brief, a concise statement of material facts, and exhibits filed under seal on June 1, 2015. (ECF Nos. 266, 267, 268.)[9]  Plaintiff filed its responsive brief, concise statement of material facts, and supporting exhibits under seal on July 1, 2015.  (ECF Nos. 275, 276, 277.)[10]  On July 13, 2015, defendants filed their reply under seal.  (ECF No. 281.)[11]  The parties filed a combined concise statement of material facts under seal on July 27, 2015.  (ECF No. 286.)[12]  Defendant's motion for summary judgment is now fully briefed and ripe for disposition.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the record shows there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—*i.e.*, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment.  *Liberty Lobby*, 477 U.S. at 248.  Even then, the dispute over the material fact must be

---

[9] On May 29, 2015, defendants filed redacted copies of their supporting brief and concise statement of material facts along with the motion for summary judgment.  (ECF Nos. 264, 265.)

[10] On June 29, 2015, redacted copies of plaintiff's brief in response to summary judgment and concise statement of material facts were filed.  (ECF No. 272, 273.)

[11] Defendants filed a redacted copy of their reply that same day.  (ECF No. 280.)

[12] A redacted copy of this document was filed.  (ECF No. 284.)

genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. *Id.* at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Id.* at 255; *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007); *Doe v. Cnty. of Centre*, 242 F.3d 437, 446 (3d Cir. 2001); *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby*, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or determine the truth of the matter, but to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citing decisions); *Liberty Lobby*, 477 U.S. at 248–49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. *Celotex*, 477 U.S. at 323; *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating

11

that there is an absence of evidence to support the nonmoving party's case.  *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (citing *Celotex*, 477 U.S. at 325).  A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements.  *Celotex*, 477 U.S. at 322–23.  Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating there is indeed a genuine and material factual dispute for a jury to decide.  FED. R. CIV. P. 56(e); *see Liberty Lobby*, 477 U.S. at 247–48; *Celotex*, 477 U.S. at 323–25.  If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law.  *Liberty Lobby*, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the [nonmovant] may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

IV.    DISCUSSION

A.        <u>**Section 1 of the Sherman Act**</u>

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" is unlawful. 15 U.S.C. § 1. The United States Court of Appeals for the Third Circuit has explained that "this statutory language imposes two essential requirements on an antitrust plaintiff." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). First, the plaintiff must show that defendants were parties to "'an agreement,' because '[§] 1 liability is predicated upon some form of concerted action.' Unilateral activity by a defendant, no matter the motivation, cannot give rise to a [§] 1 violation." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998)). Second, the plaintiff must show that the agreement in question "imposed an unreasonable restraint on trade." *In re Ins. Brokerage*, 618 F.3d at 315. While purported restraints are generally analyzed under a "rule of reason" standard, *id.*, "[h]orizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that these practices are anticompetitive is so high," *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984).

Here, plaintiff's § 1 claim is based on its assertion that "[d]efendants and their co-conspirators colluded to fix export prices and quotas for bauxite from 2003 to 2009." (ECF No. 272 at 8.) Because these alleged "'practice[s] appear . . . to be one[s] that would always or almost always tend to restrict competition and decrease output,'" an agreement to engage in them would be *per se* illegal. *In re Ins. Brokerage*, 618 F.3d at 316 (quoting *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 100). Defendants do not argue against this conclusion. Instead, they assert

summary judgment is proper because no reasonable jury could find that they entered into such an agreement.

**B.**        <u>**Proof of a Conspiracy in Restraint of Trade**</u>

In a *per se* case, "'the plaintiff need only prove that the defendants conspired among each other and that this conspiracy was the proximate cause of the plaintiff's injury.'"    *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 395 (3d Cir. 2015) (quoting *InterVest, Inc.*, 340 F.3d at 159).    Concerted action is the "very essence" of such a claim, and may be established with evidence of "'unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement.'"    *Id.* at 395 – 96 (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994)).    The required evidence may be either direct or circumstantial.    *Id.* at 396.    However, when a plaintiff relies upon circumstantial evidence that necessarily requires the court to draw inferences, antitrust law sets permissible limits upon such inferences.    *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

To that end, "'[c]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.'"    *In re Chocolate Confectionary*, 801 F.3d at 396 (quoting *Matsushita*, 475 U.S. at 588).    "[U]nless the plaintiff 'presents evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently,' summary judgment is appropriate."    *Id.*    Additionally, the plausibility of a plaintiff's economic theory behind a defendant's alleged conspiracy will also affect the range of permissible inferences.    *Id.* (citing *In re Flat Glass Litig.*, 385 F.3d 350, 357 (3d Cir. 2004)).    Presently, plaintiff argues "[t]here is both direct and circumstantial evidence that [d]efendants

14

conspired to increase prices of Chinese bauxite beginning in 2003." (ECF No. 272 at 19.) The court addresses plaintiff's assertions with respect to each kind of evidence, in turn.

### 1.     <u>Direct Evidence</u>

"Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (quoting *In re Ins. Brokerage*, 618 F.3d at 324 n.23) (noting an example of direct evidence is "a document or conversation explicitly manifesting the existence of the agreement in question"). To be considered direct evidence, the Third Circuit Court of Appeals has found that purportedly direct evidence must reach a certain level of "clarity." *InterVest, Inc.*, 340 F.3d at 162–63 (citing decisions in which documents or verbal statements that in some way referred to a conspiracy were considered as direct evidence). When a plaintiff successfully sets forth direct evidence of a conspiracy, the *Matsushita* standard does not apply because the "fact finder is not required to make inferences to establish facts." *Rossi*, 156 F.3d at 466. Direct evidence, therefore, relieves the plaintiff of the need to "adduce circumstantial evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'" *Id.* (quoting *Matsushita*, 475 U.S. at 588).

Plaintiff points to activities of members taken in relation to Bauxite Branch meetings from 2004 through 2008 as direct evidence that defendants conspired to fix prices and limit bauxite production. (ECF No. 272 at 19 – 20). Primarily, plaintiff's "direct" evidence consists of minutes from these meetings that show that defendants "voted on proposals concerning export quotas." (*Id.* at 20). Plaintiff notes Hong's email and deposition testimony regarding matters to be addressed during the November 12, 2005 meeting. (*Id.*). Plaintiff places particular emphasis

15

on the October 27, 2005, email authored by Liu Hong, vice president of defendant Bosai. (*Id.*). When taken in the context of the record before the court, a reasonable jury could not conclude that this evidence rises to the level of clarity necessary to consider it direct evidence of a conspiracy. *See InterVest, Inc.*, 340 F.3d at 162–63.

In a vacuum, proposals to set bauxite quotas at specified levels being voted on at Bauxite Branch meetings appear to indicate explicit member participation in a conspiracy to limit output. However, the Bauxite Branch's demonstrated lack of authority with respect to quotas invalidates such a finding. Since at least 2001, MOFCOM has been "responsible for deciding and announcing the types and the total quota quantity of commodities subject to bidding," not the CCCMC or its Branches. (ECF No. 268-30 at 2). The quota announced by the Bidding Committee during each of the years of the alleged conspiracy never corresponded to a resolution of the Bauxite Branch. At its 2004 through 2006 meetings, the Bauxite Branch failed to pass any resolution related to quota amount, yet the Bidding Committee, an instrumentality of MOFCOM, still announced quotas in each of those years. (ECF Nos. 275-10 through 275-12; ECF Nos. 268-52 through 268-60.) Though the Bauxite Branch passed resolutions that the quota be set at "1 million or more" tons in 2008 and 940,000 tons in 2009 (ECF Nos. 275-13, 275-14), the Bidding Committee announced quotas of only 940,000 in 2008 and 930,000 tons in 2009. (ECF Nos. 268-60 through 268-62.) No proposed quota quantity was ever less than the one ultimately announced by the Bidding Committee, which invalidates any inference that these proposals were intended to establish quotas separate from those publically announced. Any conspiracy to establish a limit equal to or higher than that imposed by the government could have no effect.

16

Consistent with the undisputed Declaration of the CCCMC, Bauxite Branch member votes for proposals concerning the yearly bauxite quota amount can only be construed as opinions offered to MOFCOM.  (ECF No. 268-22 at 2–3.)  These opinions were not that limits *should be* placed on bauxite output.  The implementation of quotas was mandated by the Chinese government, not agreed to by private entities.  *See* (ECF No. 268-26 at 2.)  Opinions only went to the level at which the otherwise required quotas should be set.  As such, these votes do not explicitly and without inference establish that Bauxite Branch members conspired to limit bauxite output.  The votes cannot be considered as direct evidence supporting a conspiracy.  *See Burtch*, 662 F.3d at 225.

The Bauxite Branch's role in determining the yearly bauxite quota undermines plaintiff's argument that Hong's email and deposition testimony concerning the November 12, 2005 meeting support the existence of a conspiracy.  In his October 27, 2005 email, Hung wrote that "CCCMC will have a meeting on Nov 12th to discuss/decide the quantity/price of bauxite quota in 2006."  (ECF No. 275.)  During his deposition, Hung testified that this statement was intended to convey that "there would be quantity and a price discussion and that we . . . would give our opinion on that."  (ECF No. 275-17 at 149.)  This explanation is consistent with the CCCMC's declaration that Bauxite Branch members were asked for their opinions pertaining to the bauxite quota during meetings, "but the authority and power to adopt quotas, and to establish the quota amount, minimum bidding price, and other terms, was always with MOFCOM."  (ECF No. 268-22 at 2–3.)  This explanation is supported by the Bidding Committee's December 6, 2005 announcement of a 970,000 ton bauxite quota for 2006 (ECF Nos. 268-57, 268-58), when the minutes of the November 12, 2005 Bauxite Branch meeting contain no reference to a single

proposal related to quota amount. (ECF No. 275-11.)  Hung's email cannot be considered direct evidence that the Bauxite Branch conspired to limit bauxite output during the November 12, 2005 meeting when it lacked the authority to do so and the quota was later set by MOFCOM through the Bidding Committee.

In addition to lacking any ability to set prices under the quota bidding system, plaintiff's purported direct evidence that Bauxite Branch members "voted to fix prices" (ECF No. 272 at 14–15) fails for a separate and independently sufficient reason.  The evidence plaintiff relies upon consists of the same meeting minutes and email from Hong, discussed above, and does not support plaintiff's claim that defendants fixed export prices.  Instead, this evidence refers to conversations about the license fee—the price of the bauxite quota—that exporters would have to pay the Chinese government for each ton of bauxite exported, not the export price at which the bauxite itself would be sold to eventual purchasers.  (ECF No. 275 (Hung's October 27, 2005 email explaining that discussions would concern the "price of bauxite *quota* in 2006" (emphasis added)).).

The specific prices in the proposals voted on at the Bauxite Branch meetings cited by plaintiff clearly indicate they were not in reference to the prices to be charged to buyers.  At Bauxite Branch meetings between 2004 and 2008, proposed "minimum prices for export quota" ranged from 60 to 180 CNY.  (ECF Nos. 268-10, 268-12, 268-13, 268-15, 275-11.)  By comparison, the "paid use" license fee was fixed at 230 CNY before exporters were required to bid the amount they would pay for the fee beginning in 2005.  (ECF No. 284, Part I ¶ 19.)  The proposals at issue could not have referred to minimum export prices where the export license fee,

a necessary component of the total price charged to purchasers, equaled or exceeded the amounts proposed.

The conclusion that the votes pertaining to "minimum price for export quota" during Bauxite Branch meetings were not in reference to the price purchasers would pay is confirmed by the prices plaintiff actually paid for bauxite during the period of the alleged conspiracy. In January and April 2004, plaintiff purchased a total of 4,150 metric tons of bauxite between two orders placed with Bosai's predecessor, Nanchuan Minerals Group Co. Ltd. ("Nanchuan"). (ECF Nos. 275-2, 275-3.) The unit cost per metric ton was $154.00 United States dollars ("USD") for the January order (ECF No. 275-2, at 7) and $172.50 USD for the April order, (ECF No. 275-3 at 3.) During the November 17, 2004 Bauxite Branch meeting, members voted on a proposal "to set 180 as the minimum price for [the] 2005 export quota." (ECF No. 268-10 at 2.) The court takes judicial notice that the exchange rate on this date was 8.2765 CNY per USD.[13] In USD, therefore, the amount being debated by the members was approximately $21.75.[14] At a time when Nanchuan was charging plaintiff a price nearly eight times higher seven months earlier and prices were steadily rising, a minimum export price of $21.75 could have served no purpose. In fact, plaintiff's own records of its bauxite purchases from late 1999 until mid-2012 show that plaintiff never paid less than $92.25 USD per ton, including the years before the

___

[13] *IMF Exchange Rates*, INT'L MONETARY FUND, http://www.imf.org/external/np/fin/ert/GUI/Pages/CountryDataBase.aspx (last visited Nov. 20, 2015).

[14] (180 CNY) / 8.2765 = $21.748324 USD.

alleged conspiracy began.[15]   The only reasonable conclusion is that Bauxite Branch proposals pertaining to the "minimum price for export quota" were in reference to the amount of the export license fee, and are not direct evidence of a conspiracy to fix export prices of bauxite.

Because plaintiff failed to adduce direct evidence from which a reasonable jury could conclude defendants conspired to fix prices and limit bauxite output, it must rely solely on circumstantial evidence to prove the existence of a conspiracy, and the strictures of *Matsushita* apply.  *Rossi*, 156 F.3d at 465–66.

## 2.   <u>Circumstantial Evidence</u>

When unable to offer direct evidence of a conspiracy, proof may come in the form of circumstantial evidence.  *In re Chocolate Confectionary*, 801 F.3d at 395 – 96.   Section 1 liability cannot be "predicated on a defendant's unilateral actions, no matter its anticompetitive motivations;" therefore, circumstantial evidence must tend to exclude the possibility of unilateral action.  *Id.* at 396 – 97.  The "range of acceptable inferences that may be drawn from ambiguous or circumstantial evidence 'varies with the plausibility of the plaintiffs' theory and the dangers associated with such inferences.'"  *Id.* at 396 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004)).  Mistaken inferences could impose liability for lawful conduct.  *Id.* (citing *Matsushita*, 475 U.S. at 594.   "[S]trong circumstantial evidence," however, will not implicate such concerns, because it is sufficiently unambiguous to limit the inferences which may reasonably be gleaned.  *Id.* at 397 n. 9.

---

[15] Plaintiff's exhibit, entitled "Resco Spreadsheet of Chinese RGB Purchases, 2000-12," and labeled "RESCO0005552" through "RESCO0005559," was submitted in hardcopy to the court, but was not electronically filed.

The evidence adduced by plaintiff as direct evidence of a price-fixing conspiracy, including the October 27, 2005, email authored by Liu Hong, may properly be considered strong circumstantial evidence, because it leaves little room for unreasonable inferences regarding defendants' conduct with respect to bauxite bidding and quotas. However, for the same reasons this evidence failed to support plaintiff's claim as direct evidence, it fails as circumstantial evidence; specifically, defendants lacked the authority to influence bauxite bidding and quotas. If anything, the October 27, 2005, email and Bauxite Branch meeting records illustrate only an opportunity to conspire. *In re Chocolate Confectionary*, 801 F.3d at 409 (evidence of mere opportunity to conspire cannot alone support an inference of conspiracy). Even viewed in the light most favorable to plaintiff, no reasonable jury could render a verdict in plaintiff's favor based upon this evidence.

### 3.    Conscious Parallelism as Circumstantial Evidence

A showing of parallel conduct or conscious parallelism is one other means of establishing the requisite proof of conspiracy via circumstantial evidence. *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 53 (3d Cir. 2007). As this court has previously noted, "special considerations" must be applied to ensure that only reasonable inferences are drawn from that kind of evidence. *InterVest*, 340 F.3d at 155–60. While "strong circumstantial evidence" will not demand restrictive inferential limits because such evidence is "sufficiently unambiguous," *In re Chocolate Confectionary*, 801 F.3d at 397 n. 9, as a general matter, parallel conduct and conscious parallelism are not considered to be strong circumstantial evidence, and "cannot alone create a reasonable inference of conspiracy." *Id.* at 398 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)). "To survive a motion for summary judgment, therefore, a

plaintiff 'must present evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently.'" *InterVest*, 340 F.3d at 160 (quoting *Matsushita*, 475 U.S. at 588).

In order to establish a successful claim supported by only conscious parallelism, "'a plaintiff must show (1) that the defendants' behavior was parallel; (2) that the defendants were conscious of each other's conduct and that this awareness was an element in their decision-making process; and (3) certain 'plus' factors.'" *Superior Offshore Int'l, Inc.*, 490 F. App'x at 498 (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d at 360 n.11). The evidence must "establish at least one 'plus factor,' since plus factors are, by definition, facts that 'tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors.'" *In re Ins. Brokerage*, 618 F.3d at 323 (quoting *In re Flat Glass*, 385 F.3d at 360 (internal alterations omitted)); *Superior Offshore Int'l, Inc.*, 490 F. App'x at 498 ("'Plus factors' are circumstances under which the inference of rational independent choice is less attractive than that of concerted action."). Though the list is admittedly non-exhaustive, the Third Circuit Court of Appeals has identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) 'evidence implying a traditional conspiracy.'" *In re Flat Glass*, 385 F.3d at 360 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993)).

Here, plaintiff argues there is "compelling evidence of 'plus' factors which would allow a fact-finder to infer the existence of a conspiracy," even in the absence of direct evidence. (ECF No. 272 at 16.) Plaintiff's evidence relates to the bauxite bidding and quotas, not to the price

paid by a buyer like plaintiff.  For reasons discussed previously, the bauxite bidding and quota evidence is not sufficient to support a finding – directly or circumstantially – that a conspiracy existed.  There was no other evidence of parallel behavior adduced and, in any event, plaintiff failed to offer sufficient evidence to establish any of the plus factors.

The establishment of plus factors is essential to any § 1 claim supported by exclusively circumstantial evidence.   Typically, a plaintiff must also show parallel behavior to survive summary judgment.  *See In re Ins. Brokerage*, 618 F.3d at 323.   As their name suggests, plus factors are only supplemental to a threshold showing of parallel behavior, meant to establish that the "allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors."  *In re Baby Food*, 166 F.3d at 122.  Without first showing some "allegedly wrongful conduct" by a defendant, there can be no evaluation of that defendant's motivation for engaging in it.  *See Superior Offshore Int'l, Inc.*, 490 F. App'x at 498 (observing a plaintiff must "adduce sufficient evidence of parallel conduct—so-called 'conscious parallelism'—and other 'plus factors' to survive summary judgment").

Plaintiff's argument against summary judgment focuses solely on the plus factors and other than the evidence of bauxite bidding and quotas makes no mention of any evidence of sufficient circumstantial evidence such as parallel behavior by defendants or other alleged co-conspirators in fixing the prices paid by buyers.  Despite its allegation that defendants conspired to limit the amount of bauxite exported through the use of quotas, the evidence shows that defendants did not have the authority or power to establish those limits; rather, the Chinese government fixed the bidding amount for the quotas and the amount of the quotas.  As discussed previously, the evidence adduced with respect to the quotas cannot support a § 1 claim, because

the Chinese government – and not defendants – set the quotas. There is no indication defendants began either producing less bauxite or turning away interested purchasers due to insufficient inventory. Plaintiff fails to point to parallel pricing behavior to support its claim that defendants fixed the price of bauxite. The nearest thing to evidence of that kind of behavior is plaintiff's unsupported assertion that the "price of RGB in the United States doubled during 2003 and 2004 and increased an additional 70 [percent] between 2004 and 2007." (ECF No. 284, Part II ¶ 4.) Even accepting this assertion as true, there is no suggestion that defendants' and other alleged co-conspirators' prices "moved in a parallel fashion" during this period. *In re Baby Food*, 166 F.3d at 128. Plaintiff presented no evidence of the amount or timing of any of the pricing increases it claims were the product of collusion. Having failed to establish the necessary element of parallel behavior, or some other wrongful conduct, by defendants with respect to bauxite output or pricing, plaintiff's § 1 claim fails as a matter of law. *Superior Offshore Int'l, Inc.*, 490 F. App'x at 498.

### 4. Plus factors

Even if plaintiff could show consciously parallel behavior by defendants, summary judgment is still proper given its failure to establish any plus factor. Plaintiff's arguments with respect to each of the three plus factors will be discussed.

### (1) First plus factor

Plaintiff attempts to satisfy the first plus factor by noting that the "export market for RGB is concentrated in the hands of several Chinese producers." (ECF No. 272 at 16.) This factor, "[e]vidence that the defendant had a motive to enter into a price fixing conspiracy[,] means evidence that the industry is conducive to oligopolistic price fixing, either interdependently or

through a more express form of collusion." *In re Flat Glass*, 385 F.3d at 360. An oligopolistic market is one in which there are few sellers. *In re Baby Food*, 166 F.3d at 122. The record does not support that the Chinese bauxite market was oligopolistic. The "Report on the Work of the Second Governing Board of the CCCMC Bauxite Branch" notes that "[sixty-two] business enterprises" were engaged in bauxite export in 2002. (ECF No. 275-7 at 1.) The minutes of the Bauxite Branch meetings from 2005 through 2009 show that between fifty-eight and eighty bauxite exporters attended each meeting. (ECF Nos. 275-10 through 275-14.) A market with that many participants does not qualify as an oligopoly. *In re Baby Food*, 166 F.3d at 128 (discussing "an oligopoly consisting of no more than three companies at one time and collectively controlling almost the entire market"). Plaintiff offered no "evidence that the structure of the market was such as to make secret price fixing feasible." *In re Flat Glass*, 385 F.3d at 360. Plaintiff, therefore, failed to establish the first plus factor.

### (2)    Second plus factor

The second plus factor is satisfied with "evidence that the defendant acted contrary to its interests," *i.e.*, "conduct that would be irrational assuming that the defendant operated in a competitive market." *In re Flat Glass*, 385 F.3d at 360. Plaintiff points only to its assertion that "Chinese bauxite exporters raised prices dramatically during the alleged conspiracy period" as an example of such conduct. (ECF No. 272 at 16.) While increased prices undeniably could be the result of a price fixing agreement, they can be "'just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" *In re Ins. Brokerage*, 618 F.3d at 321 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). As discussed above, defendants pointed to numerous external factors that

increased their cost to export bauxite.[16]  (ECF No. 284, Part I ¶ 4.)  Plaintiff disputes neither the legitimacy of these factors nor that "Bosai's RGB export price increases closely tracked the levels of the increases in prices Bosai paid for RGB."  (*Id.*)  Given these facts, plaintiff failed to adduce sufficient evidence to permit a reasonable jury to find defendants' price increases were irrational and did not satisfy the second plus factor.

### (3)  Third Plus Factor

To satisfy the third and final plus factor, plaintiff must adduce "evidence implying a traditional conspiracy."  *In re Flat Glass*, 385 F.3d at 360.  This is

> [noneconomic] evidence that there was an actual, manifest agreement not to compete[,] . . . [which] may involve customary indications of traditional conspiracy, or proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.

*Id.* at 361 (internal citations omitted).  Plaintiff relies on CCCMC and Bauxite Branch governing documents, discussions that took place during Bauxite Branch meetings, and the occurrence of separate meetings and communications between representatives of Bosai and Tianjin as evidence that a traditional conspiracy was formed.  Each of these categories of evidence is addressed below.

Plaintiff argues the existence of a conspiracy is confirmed by the CCCMC and Bauxite Branch "organizational and procedural documents."  (ECF No. 272 at 3–4.)  It should be noted at the outset that "mere membership in a trade association, including attendance at meetings, is insufficient without more to give rise to an inference of conspiracy."  *Zenith Radio Corp. v.*

---

[16] These factors included the price of bauxite more than quadrupling between 2003 and 2008, increases in transportation, loading, energy, and storage costs, the reimplementation of a 13 percent VAT in 2003, and the implementation of a 15 percent duty in 2008.  (ECF No. 284, Part I ¶ 4.)

*Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1149 (E.D. Pa. 1981) (citing decisions). By pointing to the governing documents, plaintiff essentially contends that because defendants were members of the Bauxite Branch, and the Bauxite Branch is a "self-regulation trade organization" (ECF No. 275-4 at 1) engaging in "coordination work" that should "be favorable for self-regulation, self-discipline, self-protection and self-development of the enterprise group" (ECF No. 268-4 at 2), defendants conspired to limit bauxite production and fix export prices. (ECF No. 272 at 3–4.) That inference is not reasonable.

Plaintiff calls attention to the use of the words "coordination," "self-regulation," and "self-discipline" throughout the CCCMC and Bauxite Branch governing documents to prove collusion. The meaning of those words, as intended by the subject documents, is ambiguous at best. The strongest indication that "coordination" was intended to encompass forming agreements to fix the export price of bauxite is found in the Coordination Measures. (ECF No. 268-4.) It explains that "Coordination content includes: . . . export price" and that the "Governing Board of [the] Bauxite Branch . . . shall study and decide the industrial agreement price of bauxite export." (*Id.* at 2–3.) It is unclear whether the "industrial agreement price of bauxite export" is the price to be paid by export buyers. Even assuming it is, plaintiff concedes that regulations, like the Coordination Measures, that were "promulgated in the 1990s are immaterial to this litigation." (ECF No. 284, Part I ¶ 15.) This litigation concerns allegedly illegal agreements in effect from 2003 through 2009—not the 1990s.

None of the remaining CCCMC and Bauxite Branch organizational and procedural documents in effect during the alleged conspiracy provide sufficient proof that "coordination," "self-regulation," and "self-discipline" should be understood to require the formation of

agreements to fix bauxite export prices. This evidence is, at best, ambiguous and insufficient to prove a traditional conspiracy in satisfaction of the third plus factor.

Plaintiff argues various discussions that took place at Bauxite Branch meetings are evidence of a traditional conspiracy. (ECF No. 272 at 4–5.) Plaintiff relies on the Bauxite Branch member votes on proposals related to bauxite quotas as evidence that a conspiracy was formed. (*Id.*) As discussed above, the members' lack of authority with respect to setting quota quantities and license fees and subsequent contradictory actions taken by the Bidding Committee prevent these votes from being construed as "assurances of common action" that could satisfy the third plus factor. *In re Ins. Brokerage*, 618 F.3d at 322.

Beyond these votes, plaintiff points to Liu's testimony explaining that during these meetings, the companies also "discussed whether the market was good or bad, their forecasts for supply and demand, and whether overall prices would be going up or down." (ECF No. 272 at 5.) Liu explained that the companies "complained to one another regarding low prices and unfair competition." (*Id.*) These conversations occurred during and outside of official meeting times, because "meals were arranged so that representatives of companies would have meals together." (*Id.*) Hong testified similarly concerning these topics. (*Id.*) Defendants' meeting and discussing market conditions on multiple occasions is insufficient to raise an inference of an agreement. *See Burtch*, 662 F.3d at 228 ("'[F]requent meetings between the alleged conspirators . . . will not sustain a plaintiff's burden absent evidence which would permit the inference that those close ties led to an illegal agreement.'" (quoting *Venture Tech., Inc. v. Nat'l Fuel Gas Co.*, 685 F.2d 41, 45 (2d Cir. 1982))). To support the third plus factor, evidence must suggest defendants somehow "adopted a common plan." *See In re Ins. Brokerage*, 618 F.3d at 322. Here, beyond

the insinuation underlying its assertions that defendants met and discussed prices, plaintiff offers no evidence that defendants "exchanged assurances of common action" with respect to fixing prices or limiting output of bauxite during any of these meetings. *Id.*

Finally, plaintiff points to communications by and between representatives of Bosai and Tianjin separate from Bauxite Branch meetings as evidence that a traditional conspiracy was formed. (ECF No. 272 at 6.) Plaintiff notes Hong's October 2005 email that "CCCMC will have meeting on Nov 12th to discuss/decide the quantity/price of bauxite quota in 2006." (*Id.* (quoting (ECF No. 275)).) As discussed above, MOFCOM's delegation to the Bidding Committee of the power to set such a quota combined with the Bidding Committee's announcement of the 2006 quota following the November 12, 2005 meeting supports the interpretation that Hung expected to learn the quota amount at the meeting—not to agree to it. Hong's email is not "'sufficiently unambiguous' evidence that the defendants conspired." *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1233 (quoting *Matsushita*, 475 U.S. at 597).

In addition to Hong's email, plaintiff asserts "[d]efendants also engaged in other direct communications and held in-person meetings" to prove a conspiracy among them. (ECF No. 272 at 6.) Plaintiff offered no evidence about the substance of the conversations that took place on these occasions. At best, the occurrences of these direct communications and in-person meetings show defendants had the *opportunity* to conspire. The Third Circuit Court of Appeals has held, however, that "[p]roof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1235.

Plaintiff failed to establish sufficient circumstantial evidence such as consciously parallel behavior by defendants or the existence of the plus factors. There is insufficient circumstantial evidence as a matter of law to support plaintiff's § 1 claim. *See Superior Offshore Int'l, Inc.*, 490 F. App'x at 498.

V.    CONCLUSION

Because plaintiff failed to adduce sufficient direct or circumstantial evidence of a conspiracy, summary judgment is proper. *See Rossi*, 156 F.3d at 465-66. No reasonable jury could render a verdict in favor of plaintiff on its claims. For the reasons set forth in this opinion, defendants' motion for summary judgment (ECF No. 263) will be granted.

An appropriate order will be entered.


                                                        *s/ Joy Flowers Conti*
                                                        Joy Flowers Conti
                                                        Chief United States District Judge


Dated: January 25, 2016
cc/ecf: All counsel of record